■ In the Matter of SHERLINDA MEDINA, Respondent, v ALLYN SIELAFF, as Correction Commissioner of the City of New York, et al., Appellants.—Judgment of the Supreme Court, New York County (Carol E. Huff, J.), entered on December 11, 1990, which granted the petition to the extent of remanding the matter to respondent Department of Correction for the purpose of conducting a hearing to determine whether petitioner's dismissal was in good faith, is reversed on the law and the petition denied and dismissed, without costs or disbursements.

Petitioner was appointed on March 2, 1989 as a probationary correction officer subject to the successful completion of an eighteen month period of probation. On June 25, 1989 at approximately 5:40 P.M., while assigned to the fourth floor Fire Watch post of a prison barge moored on Pier 36 of the East River, she asked Correction Officer Edwardo Nazanio to relieve her for a "personal", a short break from duty allowed for personal necessities, such as using the restroom. Nazanio agreed, and petitioner wrote in her log book that she was taking a "personal". Instead, petitioner proceeded to the third floor stairwell where she requested access from Correction Officer Che Chan who, unaware that she was not authorized to enter the second floor area, gave her permission. She then went downstairs to speak with one of the inmates housed there, Manuel Cedeno, also known as Frankie. At about 6:00 P.M., Correction Officer Rene Bonilla, during a tour of inspection, observed petitioner engaged in a conversation with a second floor prisoner. Another correction officer, Michael Scarmuzza, also noticed her talking with an inmate in that same area. Shortly thereafter, Assistant Deputy Warden Gloria McNeil and Captain Johnie Hugee saw petitioner banging frantically on the second floor door to the stairway in an effort to exit.

Assistant Deputy Warden McNeil, suspecting that petitioner's presence on the second floor was unsanctioned, ordered an investigation into the matter. The following day, Captain Rafael Velez began the inquiry. Accordingly, he requested written reports from the officers who had witnessed petitioner's activities. In addition, she was questioned by Assistant Deputy Warden McNeil, Captain Hugee and Captain Velez concerning her abandonment of her post. Petitioner initially stated that she had gone to the second floor to speak with

Manuel Cedeno about false rumors that she had written him love letters. However, in a private discussion with Assistant Deputy Warden McNeil, she confessed to a personal involvement with the inmate, admitting that she had received letters from him and had written to him on two occasions. She subsequently also acknowledged to Captain Velez that she had written two letters to Cedeno, explaining that she had urged Cedeno to destroy her correspondence in the event of a search of the facility. Petitioner was then instructed to submit written reports of her relationship with inmate Cedeno and her reasons for leaving her post. Although she complied with this directive, her response, in the view of respondent Department of Correction, was not prompt.

In the meantime, Cedeno's cell was searched, and he himself was interrogated. Investigators discovered several unmailed love letters addressed to petitioner, as well as her home telephone number on the inside back cover of his bible and a newspaper clipping of the horoscopes for their respective astrological signs. In a written report prepared by Cedeno, he claimed that petitioner had once asked him for a kiss when he was working in the mess hall, sent him love letters and would frequently visit him in his cell. Petitioner finally conceded that Cedeno had given her love letters, but, in her written reports on the situation, she omitted any reference to her correspondence with Cedeno. She merely asserted that Cedeno would talk to her about family problems, and she left her post on June 25th to discuss the rumors circulating that she had written him love letters. Consequently, after reviewing the evidence, Captain Velez proposed to the warden that petitioner be terminated for fraternizing with an inmate, leaving her post without permission and entering an unauthorized area. The warden, in turn, recommended to the Committee on Uniformed Personnel (COUP) that she be discharged for serious departmental infractions.

COUP deferred any decision until after the completion of a full and independent inquiry by the Investigation and Discipline Division. In that regard, Cedeno stated that he had met petitioner shortly after her present assignment and that she would often come to his cell to discuss personal problems, including advising him on his marital difficulties. Petitioner, he said, had written him love letters, but he had destroyed them upon her warning of a possible facility search. Cedeno was able to recite petitioner's home telephone number from memory and was aware that she lived in Brooklyn. At the conclusion of its probe, the Investigation and Discipline Divi-

sion recommended that petitioner be terminated for her violation of Correction Department rules and regulations, including entering an unauthorized area, leaving her post without proper permission, engaging in undue familiarity with an inmate, engaging in conduct unbecoming to an officer, bringing discredit upon the department, preparing false reports and log entries and neglecting her duty. All twelve members of COUP examined petitioner's file and unanimously voted to discharge her.

The instant proceeding pursuant to CPLR article 78 ensued. In it, petitioner seeks reinstatement and back pay. She alleges that notwithstanding that she was purportedly terminated for fraternizing with an inmate, she was really dismissed in bad faith and as a pretext for illegal sex discrimination. The discrimination supposedly originated in her role in the discipline meted out to a male correction officer. Petitioner contends that this officer masturbated in the presence of her and another female correction officer and that she reported him to his superiors. As a result, charges were filed against the officer, and, after a hearing was held at which she testified, he was terminated. Petitioner claims that she thereafter became the victim of demeaning rumors, sexual stereotyping, sexual harassment, unwelcome sexual advances and lewd comments. Due to her notoriety, petitioner asserts, she was "accused by a captain of undue familiarity with an inmate, who, on information and belief, boasted that petitioner had written him love letters and given him her telephone number, all of which petitioner vehemently denied." It is petitioner's position that respondents knew or should have known of the pervasive atmosphere of sexual harassment, which they failed to remedy, thereby giving rise to an inference of unlawful sex discrimination. Petitioner further deplores the Correction Department's failure to divulge the reasons for her discharge as contributing to her stigmatization, alleging that her termination, along with the refusal to consider her for reinstatement, demonstrates respondents' bad faith.

In reply to respondents' motion for a dismissal of the petition, petitioner conceded that she never filed a report of sexual harassment with the Correction Department's Equal Employment Opportunity Commission office since she allegedly did not know how or where to make a complaint and, at any rate, believed that a formal complaint would imperil her probationary status. According to petitioner, she visited Cedeno on June 25th because she was informed by another correction officer that Cedeno was spreading rumors that she

had written him love letters, and she denied that she had ever confessed a personal involvement with Cedeno, that she had sent love letters to him or received any from him or that she had fraternized with any inmate. Petitioner also avers that she asked Cedeno "about the rumors and he denied saying anything about fraternizing or corresponding" with her. In granting the petition to the extent of ordering the Department of Correction to hold a hearing, the Supreme Court concluded that "[p]etitioner has made a *prima facie* showing of sexual harassment. Her dismissal was predicated on considerations which would affect the reputation, good name and integrity of petitioner. Because of the effect of such social stigmatization, due process requires that petitioner be afforded an opportunity to refute allegations made against her."

The standard for reviewing the termination of a probationary employee was recently noted by this court in *Matter of Soto v Koehler* (171 AD2d 567, 568, *lv denied* 78 NY2d 855), wherein we stated: "A probationary employee can be dismissed 'without a hearing and without a statement of reasons in the absence of any demonstration that dismissal was for a constitutionally impermissible purpose or in violation of statutory or decisional law' *(Matter of York v McGuire,* 63 NY2d 760, 761). Judicial review of such a determination 'is limited to an inquiry as to whether the termination was made in bad faith.' *(Matter of Johnson v Katz,* 68 NY2d 649, 650.) The burden of raising and proving such 'bad faith' is on the employee and the mere assertion of 'bad faith' without the presentation of evidence demonstrating it does not satisfy the employee's burden *(see, Matter of Cortijo v Ward,* 158 AD2d 345)."

Although a probationary employee who shows that his or her dismissal was for a constitutional or statutory violation is entitled to a hearing *(Matter of York v McGuire,* 63 NY2d 760, *supra),* mere conclusory allegations of bad faith are insufficient to meet the burden of establishing bad faith *(Matter of Cortijo v Ward,* 158 AD2d 345, *supra; Matter of Jessamy v Fernandes,* 145 AD2d 486). In the instant matter, petitioner herself admitted that she was off post and went to an unauthorized section of the prison barge in order to visit with an inmate. Thus, regardless of whether or not she was, in fact, engaged in a personal relationship with Cedeno, and even putting aside for purposes of this analysis the ample corroborative testimony of witnesses, her own concessions were sufficient to support the reasonableness of respondents' actions. Since petitioner was clearly in violation of departmental rules

and regulations, her discharge was rationally based notwithstanding speculation that the Department of Correction's underlying motivation was improper *(see, Matter of Anonymous v Codd,* 40 NY2d 860, *rearg denied* 40 NY2d 1080).

Petitioner's claim that unidentified correction officers and inmates directed sexual advances and lewd comments at her certainly does not negate the substantial evidence that her job performance was inadequate. Similarly, the record herein is devoid of any indication that respondents publicly disseminated reasons for petitioner's termination, thereby stigmatizing her so as to warrant a name-clearing hearing *(Matter of Lentlie v Egan,* 61 NY2d 874; *Matter of Ortiz v Ward,* 155 AD2d 245). On the contrary, respondents refused to divulge the reasons for her termination when inquiries in that respect were raised on her behalf. Moreover, this court has already rejected the argument that a name-clearing hearing is justified simply because of the disclosure by the Correction Department to the Labor Department of petitioner's personnel file in connection with her application for unemployment insurance *(see, Matter of Ortiz v Ward, supra).* Consequently, the petition should have been denied and dismissed. Concur—Sullivan, J. P., Milonas, Kupferman, Asch and Smith, JJ.